# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO.: 1:14-cv-24347

JAMES RESNICK, LIDIA RESNICK,
STEVEN RESNICK, ELIZABETH
RESNICK, and GREEN ARM FAMILY,
L.P.,

      Plaintiffs,

v.

CHEN NEAL LLC, a Delaware limited
liability company, and MICHAEL
PULWER, individually,

      Defendants.

_____/

## COMPLAINT

James Resnick ("*J. Resnick*"), Lidia Resnick ("*L. Resnick*"), Steven Resnick ("*S. Resnick*"), Elizabeth Resnick ("*E. Resnick*") and Green Arm Family, L.P. ("*Green Arm*" and together with J. Resnick, L. Resnick, S. Resnick and E. Resnick, the "*Plaintiffs*") sue Chen Neal LLC ("*Chen Neal*") and Michael Pulwer ("*Pulwer*").  In support, the Plaintiffs state as follows:

### Preliminary Statement

In 1999, a group of friends purchased a parcel of real property through a corporation they created.  The friends agreed that the corporation would own the property, which would be controlled by, and leased to, one of the friends: defendant Pulwer.  Pulwer had control over the enterprise (the Property and the tenant), and received and accepted the trust and confidence of his co-shareholders.  The co-shareholders relied on Pulwer for all material aspects of the enterprise.

Approximately 14 years later, Pulwer was approached to sell the property at a significant premium.  Rather than informing his friends and co-shareholders of this opportunity so that they could jointly reap the benefits, Pulwer concealed this special knowledge.  Instead, Pulwer

1

commenced communications with his co-shareholders and offered to buy their shares at a price which did not take into consideration their true value, known only by Pulwer. After purchasing the shares from the co-shareholders for significantly less than their true value, Pulwer sold the property owned by the corporation for significantly more per share, realizing the benefit of the premium for himself to the detriment of the co-shareholders (the Plaintiffs).  Pulwer's unjustly obtained profit - - off the backs of his (now former) friends and co-shareholders - - was in the millions of dollars.

Pulwer is liable to the Plaintiffs as his actions constituted, among other things, a material omission in the purchase and sale of securities, a breach of fiduciary duty, and fraud.

## Jurisdiction and Venue

1.      The claims asserted herein include claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq* (the ***"1934 Act"***) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder (the ***"10b-5 Claim"***).

2.      In connection with the 10b-5 Claim, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, emails through the internet. Certain of the acts and practices occurred within the Southern District of Florida, including the alleged torts.

3.      Jurisdiction is conferred upon this Court pursuant to §27 of the 1934 Act (15 U.S.C. §78aa) as to the 10b-5 Claim, and pursuant to 28 U.S.C. § 1367(a) as to all other claims.

4.      Venue is proper in this Court pursuant to §27 of the 1934 Act.

## Parties

5.      DOWNBYRIVER Miami, Inc. (***"DBRM"***) is a Florida corporation and was created in 1999.

6.      DBRM owned the Property (as defined below) at issue in this complaint.

7.      J. Resnick, L. Resnick, S. Resnick, and E. Resnick are individuals, residents of Miami-Dade County and were shareholders of DBRM.

8.      Green Arm is a Florida Limited Partnership, does business in Miami-Dade County, Florida, and is a resident, for jurisdictional purposes of Miami-Dade County Florida.

9.      Green Arm was formerly a shareholder of DBRM.

10.      Defendant Pulwer was, at all times material to this lawsuit, a resident of Miami-Dade County, Florida and is *sui juris*.

11.      Defendant Pulwer was the principal of DBRM and its tenant, and was primarily responsible for all operations concerning the Property.

12.      Chen Neal is a Delaware Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

13.      Chen Neal is either legally or beneficially owned by Pulwer, and was a shareholder of DBRM.

14.      J. Resnick and L. Resnick are husband and wife, and their children include S. Resnick (who is married to E. Resnick), David Resnick and Andrew Resnick.

15.      Andrew Resnick controls Green Arm.

16.      At all material times and known to all parties, J. Resnick communicated with Pulwer on behalf of L. Resnick, S. Resnick, E. Resnick, David Resnick and Green Arm about DBRM and DBRM-related matters.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**Factual Allegations**

    **A. <u>DBRM's Business Operations, and Pulwer's Control</u>**

17.    DBRM owned certain real property located at 224 SW 6th Street, Miami, Florida (the "***Property***"). The Property is an ordinary converted warehouse near the Miami River.

18.    DBRM's sole business was the ownership, operation and lease of the Property to PEDT (as described below).

    **(i)    <u>Ownership Transfers</u>**

19.    At its creation, DBRM's corporate structure was as follows: (i) Pulwer owned 40%; (ii) J. Resnick and L. Resnick owned 30%; (iii) S. Resnick and E. Resnick owned 10%; (iv) David Resnick owned 10%; and (v) non-party Laurence Feingold owned 10%.

20.    At all material times, Laurence Feingold was Pulwer's attorney.  Moreover, in 1999 (around DBRM's inception), Laurence Feingold assigned all of the voting rights to his DBRM shares to Pulwer, and provided control over his shares to Pulwer.  Thus, Pulwer controlled 50% of DBRM's shares.

21.    Prior to the actions described herein, Pulwer transferred his 40% interest in DBRM to Chen Neal, LLC (***"Chen Neal"***), an entity he owns and/or controls.

22.    Prior to the actions described herein, David Resnick transferred his 10% interest in DBRM to Green Arm.

23.    Thus, prior to the events which give rise to the cause of action described herein, DBRM's corporate structure was as follows: (i) Pulwer's entity, Chen Neal, owned 40%; (ii) Pulwer's lawyer, Laurence Feingold, owned 10% (the control of which was assigned to Pulwer); (iii) J. Resnick and L. Resnick owned 30%; (iv) S. Resnick and E. Resnick owned 10%; and (v) Green Arm owned 10%.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

24. Thus, Pulwer controlled 50% of DBRM.

**(ii)     Pulwer's Control Over DBRM and the Property**

25. Not only did Pulwer control the Property's tenant, PE D.T. Miami, Inc. (**"PEDT"**), but he also exercised control over DBRM as well.

26. At all material times, Pulwer was an officer and/or director of DBRM, or a *de facto* officer and / or director of DBRM.

27. Pulwer was not listed with the Florida Secretary of State as an officer or director of DBRM; however, Laurence and Renee Feingold were identified in the public records as officer and / or director of DBRM, with Pulwer maintaining control.

28. Non-party Renee Feingold is Laurence Feingold's wife.

29. Indeed, Renee Feingold never had any material involvement with DBRM, and Laurence Feingold's voting interests were given to his long-time client, Pulwer.

30. Pulwer's control over and *de facto* officer and/or director status of DBRM is evident from early-on. On September 29, 1999 and after preparing the lease agreement between DBRM (as landlord) and PEDT (as tenant), (the **"Lease Agreement"**) Laurence Feingold wrote to Pulwer and to Plaintiff J. Resnick (the **"Letter"**) as follows:

> Since we don't want Michael [Pulwer] signing a Lease with himself, I have assumed the office of Assistant Secretary to sign the Lease on behalf of Lessor.

31. This sentence means that Pulwer himself was an officer, or otherwise an authorized signatory and controlling person, of both entities, the tenant and DBRM.

32. Consistent with the Letter, Laurence Feingold, rather than Pulwer, signed the Lease Agreement on behalf of DBRM.

33.     In fact, upon information and belief, when DBRM executed a note and mortgage in favor of Regions Bank, Regions Bank demanded that Pulwer (and no one else) guarantee the obligation, which Pulwer guaranteed.

34.     Moreover, Pulwer maintained control over DBRM and the Property's operations on a day-to-day basis.

35.     At all material times, Pulwer had the responsibility for, and care of, items such as the mortgage payments owed by DBRM and secured by the Property, fees for services for the Property and DBRM, fees for professionals for DBRM, payment of the Property's taxes and DBRM's taxes, and other financial responsibilities of DBRM and the Property.

36.     In fact, Pulwer took care of all of these items.

37.     DBRM's "principal place of business" and "mailing address," were maintained at a location that Pulwer controlled, specifically 1019 5th Street, Miami Beach, Florida, from at least April 2011 through all times material to this action.

38.     Pulwer kept DBRM's financial information and books and records, and prepared (or caused to be prepared) DBRM financial statements ("**DBRM Financial Statements**"), through his own financial personnel and bookkeeper.

### (iii)     Pulwer's Control Over the Property's Tenant, PEDT

39.     From DBRM's inception, the Property's sole tenant, and the sole source of DBRM's income, was the lease of the Property from DBRM to PEDT.

40.     At all material times, Pulwer was the controlling person and majority owner of PEDT.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

41.    Laurence Feingold represented PEDT as its legal counsel.  Further, either Renee Feingold, or Renee and Laurence Feingold's daughter, Tamar Feingold, was identified as "President" of PEDT in all filings with the Florida Secretary of State.

42.    Despite these filings, which were a sham, at all material times Pulwer was the *de facto* officer, director and controlling person of PEDT.

43.    In fact, Pulwer executed the Lease Agreement between DBRM and PEDT as PEDT's President, and otherwise represented himself as PEDT's President.

44.    Upon information and belief, neither Renee Feingold nor Tamar Feingold had any material involvement in PEDT; their sole roles were to appear as President and / or Director of PEDT, as a service for their family member Laurence Feingold to assist his client, Pulwer.  Their titles and roles were a complete farce.

### (iv)    The Plaintiffs Placed Trust and Confidence in Pulwer as to DBRM

45.    With regard to the business, operations and anything else materially having to do with DBRM, the Plaintiffs placed their trust and confidence in Pulwer, and relied on Pulwer, and Pulwer accepted such trust and confidence.

46.    Plaintiffs relied and depended on Pulwer as an accurate and timely source of information, as to anything material having to do with DBRM.

47.    Members of the Resnick family, including J. Resnick and David Resnick, have been close friends with Pulwer for many years.

48.    Pulwer regularly prepared and distributed the DBRM Financial Statements to the Plaintiffs.  A selection of certain such DBRM Financial Statements is attached as **Exhibit A**.

49.    The Plaintiffs relied on Pulwer for the financial operations of DBRM, as its primary source of income was payments on the Lease from PEDT, Pulwer's wholly owned entity

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

(which he operated).  The Plaintiffs relied on Pulwer's accountings and financial distributions, and the truth and accuracy of the same.

50.     Thus, Pulwer sat in a fiduciary position in relation to his DBRM co-shareholders, including the Plaintiffs. These fiduciary duties include, but are not limited to, fiduciary duties of care and loyalty, and the duty to disclose material information to Plaintiffs, and not to usurp a corporate opportunity.

###     B.      Pulwer's Special Knowledge of the Property's Value

51.     According to now-published reports, sometime in early 2012, real estate agent, Chris Deitz of Fite, Shavell & Associates ("**Deitz**") began contacting owners of real property in Miami in order to assemble property in close proximity of upcoming developments.  Over the next few months, Deitz called real property owners / controlling persons and preliminarily secured a contiguous assemblage of real property (the ***"Property Assemblage"***).

52.     Once the sellers were "on board," Deitz partnered with a second real estate brokerage, Brian Webster of Wester's International Realty ("**Webster**," and together with Deitz, the "***RE Brokers***") to find a buyer.  The buyer they found was CG Florida Properties ("***Buyer CG***").

53.     As a part of this process, between 2012 and September 3, 2013, the RE Brokers contacted Pulwer as a representative of DBRM regarding purchasing the Property for inclusion in the Property Assemblage.

54.     Deitz has stated that "In early 2012 . . . I went down and started to scout areas where I could assemble property in close proximity of other upcoming developments. I proceeded to call over the next few months and secured a continuous assemblage of properties."

55.     By virtue of Pulwer's knowledge that (i) the RE Brokers intended to broker the sale of the Property; (ii) that the Property was to be included in the Property Assemblage; and (iii) the associated effect increasing the value of the Property, Pulwer gained special knowledge that the value of the Property, and by extension, the value of the shares in DBRM, had increased (the ***"Special Knowledge"***).

56.     Pulwer gained the Special Knowledge prior to September 3, 2013.

57.     Pulwer knew that the Plaintiffs, to whom he owed a fiduciary duty and who relied on him as a timely and accurate source of information as to anything material regarding DBRM, did not have the Special Knowledge and were ignorant of the DBRM stock's increased value.

58.     Pulwer knew that Plaintiffs (1) would rely on Pulwer's representations and omissions; and (2) had placed their trust and confidence in Pulwer, which he had accepted.

59.     Pulwer did not disclose the Special Knowledge to the Plaintiffs.

**C.      After Obtaining the Special Knowledge and Without Disclosing the Special Knowledge to the Plaintiffs, Pulwer Purchased Plaintiffs' shares in DBRM**

60.     Armed with this Special Knowledge which remained undisclosed to Plaintiffs, Pulwer communicated with Plaintiffs (*via* instruments of interstate commerce, such as e-mail) regarding purchasing Plaintiffs' shares in DBRM.  These communications included discussions regarding the value of the DBRM stock, and how to calculate same.

61.     Neither Pulwer nor Chen Neal (nor anyone else) disclosed the Special Knowledge to the Plaintiffs, and the Plaintiffs were ignorant as to the Special Knowledge.

62.     On or about September 3, 2013, Plaintiffs and Chen Neal entered into a Securities Purchase Agreement ("***SPA***").

63.     Through the SPA, Plaintiffs and Pulwer (through Chen Neal) agreed that Pulwer (through Chen Neal) would purchase all of the Plaintiffs' stock in DBRM for a total of $1

9

Million, or $20,000.00 per share (the **"Purchase Price"**).  The Purchase Price valued DBRM (whose sole asset was the Property and the Lease) at $2 Million.

64.     The Purchase Price was far less than what Pulwer (and Chen Neal) knew the DBRM stock was worth, and the Property was worth, due to the Special Knowledge.

65.     Still armed with this Special Knowledge, and again without having disclosed it to Plaintiffs, on or about January 6, 2014, Pulwer (through Chen Neal) closed on the transaction contemplated in the SPA (the "**Closing**").  The Plaintiffs and Pulwer (through Chen Neal) communicated, either individually or through counsel, regarding the SPA, Closing and payment contemplated therein *via* instruments of interstate commerce, such as e-mail. One such e-mail (of the many) is attached as **Exhibit B**.

### D.     Only Six (6) Months after the Closing, DBRM, through Pulwer, sells the Property to CG for $6.5 Million

66.     On or about July 16, 2014, DBRM, now wholly owned / controlled by Pulwer (including through Chen Neal) sold the Property to Buyer CG for $6.5 Million (the "**CG Sale**"). This was a part of an approximately $98 Million acquisition of eight (8) adjacent properties with 20 addresses.

67.     Based on the $6.5 Million sale price, the DBRM shares had a valuation of $65,000.00 per share.[1]

68.     Accordingly, as of the date of the Closing, the DBRM shares were worth considerably more than $20,000 per share, and closer to, if not exactly (or more than), $65,000.00 per share.

---

1 This assumes neither debt nor expenses, or possibly additional value (through tax ramifications or otherwise).  The Plaintiffs recognize that this number may be reduced / increased on this basis, and reserves the right to amend based on discovery and gaining the pertinent information.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**E.**      <u>Since the CG Sale, Pulwer has Avoided the Plaintiffs</u>

69.      On or about July 30, 2014, the CG Sale was publicly discussed in trade publications.  The Property Assemblage was clearly "newsworthy," with the media referring to it as the "Miami Riverwalk" project.

70.      Upon learning of the CG Sale, and consideration of the following timeline:

   (i)      <u>September 3, 2013</u>: Pulwer (through Chen Neal) signs the SPA, whereby the DBRM shares were to be purchased for $20,000 each, a DBRM valuation of $2 Million;

   (ii)      <u>January 6, 2014</u>: Pulwer (through Chen Neal) closes on the SPA, purchasing the DBRM shares for $20,000 each, a DBRM valuation of $2 Million; and

   (iii)      <u>July 16, 2014</u>: The CG Sale, whereby DBRM sold the Property for $6.5 Million, valuing the DBRM shares at $65,000.00 each, as one parcel of a $98 million purchase of the Property Assemblage;

the Plaintiffs tried to communicate with Pulwer to discuss how the CG Sale transpired, with Pulwer making millions of dollars "flipping" the DBRM stock sold to him by the Plaintiffs in an amazingly short time frame.  To the Plaintiffs, it is simply common sense that a $98 Million Property Assemblage purchase takes significant time to put together, and in fact, published reports identified that the seller / property owners of the Property Assemblage were all contacted in 2012.

71.      Pulwer consistently avoided the Plaintiff's attempts to communicate with him, clearly evidencing his wrongdoing, bad acts and bad intent.

72.      As one example, an e-mail chain (attached as **<u>Exhibit C</u>**) between Plaintiff J. Resnick and Pulwer beginning days after the CG Sale was reported in the news, reads as follows, with the subject line of "DownbyRiver":

- <u>August 3, 2014 at 1:17 p.m., J. Resnick to Pulwer</u>:

  Besides being your partner for over 15 years, I consider you a close friend. I'm perplexed that you have chosen not to return my calls, emails and texts. I can only surmise that you aren't comfortable with what transpired with the sale of the property as it pertains to you and my family.

- <u>Aug 3, 2014, at 3:10 p.m., Pulwer to J. Resnick</u>:

  Not true at all. If u would like to discuss face to face we can do so

- <u>August 3, 2014 at 5:51 p.m., J. Resnick to Pulwer</u>:

  When and where?

- <u>Aug 3, 2014, at 7:16 p.m. Pulwer to J. Resnick</u>:

  I might not b available till Thurs at which point we could meet anytime. If something changes and I can do it sooner, I will let u know. I look forward to seeing u.

- <u>Aug 3, 2014, at 7:20 p.m., J. Resnick to Pulwer</u>:

  Ok let me know when

- <u>Aug 7, 2014, at 11:03 a.m., Pulwer to J. Resnick</u>:

  Hi Jimmy
  Not looking good to meet today. How is tomoro or next couple of days?

- <u>Aug 7, 2014, at 11:32 a.m., J. Resnick to Pulwer</u>:

  Tomorrow anytime after 3

- <u>August 10, 2014, 7:41 a.m., from Pulwer to J. Resnick</u>:

  Good morning. I caught a bad cold and have basically tried to relax and get better. Will let u know when we can meet. Thanks

73.    Despite repeated efforts, Pulwer never met with J. Resnick.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

## COUNT I
### Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act
#### (against Chen Neal and Pulwer)

74.     The Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 73 of this complaint as if fully restated herein.

75.     The Plaintiffs placed trust and confidence in Pulwer, and in his advice, information and representations, due to their several years of close friendship, the pattern of conduct between them, Pulwer's control of and over DBRM, including its financials, and Pulwer's organization and dissemination of financial information (including the Annual Financial Statements) to the Plaintiffs.  Pulwer accepted this role.

76.     Indeed, Pulwer willingly accepted and responded to the Plaintiffs' requests for advice and direction as to DBRM.

77.     Pulwer intentionally or recklessly:

- Misrepresented or omitted material information to the Plaintiffs as to the value of DBRM and DBRM stock in view of his Special Knowledge, and the Plaintiffs' ignorance as to the Special Knowledge;

- Failed to disclose his intentions, plans and communications to sell DBRM or the Property;

- Failed or omitted to provide accurate advice or information to the Plaintiffs upon learning or knowing that DBRM's primary asset, the Property, was of increased interest to buyers in the marketplace; and

- Manipulated and induced the Plaintiffs to sell their DBRM stock at prices known to Pulwer to be grossly understated;

all with the purpose to financially benefit himself to the detriment of the Plaintiffs.

78.     Pulwer and Chen Neal each carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the Plaintiffs as to the fair market value of their

13

DBRM stock; (b) intentionally understate the fair market value of the DBRM stock; and (c) cause the Plaintiffs to sell their DBRM stock to Chen Neal, controlled and owned by Pulwer, at the undervalued price of $20,000 per share.

79.    This price was known to Pulwer and Chen Neal to be undervalued because of the Special Knowledge, which Pulwer and Chen Neal had and which they were required to, but did not, disclose to the Plaintiffs.

80.    Pulwer and Chen Neal voluntarily undertook a duty to disclose information to the Plaintiffs concerning DBRM based on (among other things) their other communications with the Plaintiffs, their course of conduct, and their fiduciary position to the Plaintiffs, over a number of years.  Indeed, Pulwer was the controlling person over both DBRM's operations and PEDT's operations, and served as a *de facto* officer and director, if not a technical officer and director, of both entities.

81.    Pulwer, both individually and as the representative of Chen Neal, had private communications with the Plaintiffs regarding the valuation of DBRM and its stock, and during those conversations, had the Special Knowledge but failed to disclose it to the Plaintiffs.

82.    Upon the CG Sale, Pulwer and Chen Neal reaped financial benefits which properly belonged to the Plaintiffs.

83.    Pulwer and Chen Neal had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result, and despite that knowledge, intentionally pursued that course of conduct, resulting in Plaintiffs' damages.

84.    From prior to September 2013 through January 2014, Defendants, Chen Neal and Pulwer, directly and indirectly, by use of the communication in  interstate commerce or by use of the mails  in  connection  with  the  purchase  or  sale  of  securities,  as  described  herein,  have

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

knowingly, willfully, or extremely recklessly: (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to ensure the statements made were not misleading in the light of the circumstances under which they were made; and (iii) engaged in acts, practices and courses of business which have operated as a fraud or deceit upon Plaintiffs.

85.     By reason of the foregoing, Chen Neal and Pulwer, directly and indirectly, violated Section 10(b) and Rule 10b-5 of the 1934 Act. [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5].

86.     In doing so, as a direct and proximate cause of Chen Neal and Pulwer's wrongful conduct, the Plaintiffs suffered millions of dollars in damages in connection with the sale of their DBRM stock.

**WHEREFORE**, the Plaintiffs respectfully request that the Court award, jointly and severally against the Pulwer and Chen Neal, all available relief permitted under the 1934 Act including, but not limited to, a judgment including the following: (i) compensatory damages in favor of the Plaintiff and against Chen Neal and Pulwer, jointly and severally, for all damages sustained as a result of these Defendants' wrongdoing, in an amount to be proven at trial, plus applicable prejudgment interest thereon at the legal rate; (ii) the Plaintiffs' reasonable costs and expenses incurred in this action, including attorney's fees in the maximum amount permitted; and (iii) such other and further relief as the Court deems just and proper.

<u>COUNT II</u>
**Breach of Fiduciary Duty**
(Against Pulwer)

87.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 of this complaint as if fully restated herein.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

88.     As the largest shareholder, *de facto* officer and director if not technical officer and director, and controlling person of DBRM, Pulwer owed a fiduciary duty to Plaintiffs, his co-shareholders.

89.     Pulwer also owed fiduciary duties to the Plaintiffs because of their several years of close friendship, the pattern of conduct between them, Pulwer's control of and over DBRM, including its financials, and Pulwer's organization and dissemination of financial information (including the Annual Financial Statements) to the Plaintiffs.  Indeed, Pulwer willingly accepted and responded to the Plaintiffs' requests for advice and direction as to DBRM.  The Plaintiffs placed trust and confidence in Pulwer, and in his advice, information and representations, and Pulwer accepted this role.

90.     Pulwer breached his fiduciary duties to the Plaintiffs when he intentionally or recklessly:

- Misrepresented or omitted material information to the Plaintiffs as to the value of DBRM and DBRM stock in view of his Special Knowledge, and the Plaintiffs' ignorance as to the Special Knowledge;

- Failed to disclose his intentions, plans and communications to sell DBRM or the Property;

- Failed or omitted to provide accurate advice or information to the Plaintiffs upon learning or knowing that DBRM's primary asset, the Property, was of increased interest to buyers in the marketplace; and

- Manipulated and induced the Plaintiffs to sell their DBRM stock at prices known to Pulwer to be grossly understated;

all with the purpose to financially benefit himself to the detriment of the Plaintiffs.

91.     Pulwer also breached his fiduciary duties by acquiring special knowledge of a corporate opportunity, *i.e.,* the opportunity to sell the Property at an increased value, but did not present the opportunity to his co-shareholders in DBRM, the beneficiaries of his fiduciary duties,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

and instead engaged in a course of action which would utilize the opportunity to benefit himself, and to harm the Plaintiffs.

92.     The Plaintiffs reasonably relied on the information and advice given them by Pulwer, and sold all their DBRM stock.  Pulwer failed to communicate with or advise the Plaintiffs appropriately, even though he knew that the Plaintiffs were selling their DBRM stock in reliance upon inaccurate, erroneous, incomplete and misleading information and advice that Pulwer had given, thus breaching his fiduciary duties.

93.     As a direct and proximate result of Pulwer's breaches of his fiduciary duties, the Plaintiffs suffered injury when they sold the DBRM stock at prices that Pulwer knew were grossly understated with resulting damages to the Plaintiffs.  Pulwer received personal gain from the Plaintiff's sale of the DBRM stock as he was the controlling person and owner of the buyer, Chen Neal.

**WHEREFORE**, the Plaintiffs respectfully request that the Court award, against Pulwer and in favor of the Plaintiffs, a judgment including damages as follows: (i) compensatory damages for all damages the Plaintiffs sustained as a result of Pulwer's wrongdoing in connection with the Plaintiffs' sale of their DBRM stock in an amount to be proven at trial, plus applicable pre-judgment interest thereon at the greatest legal rate; (ii) the reasonable costs and expenses, including attorney's fees, incurred in this action, to the extent permissible by law; (iii) punitive or exemplary damages in the greatest amount found by the jury for Pulwer's intentional breaches of fiduciary duty; and (iv) all such other and further relief as the Court deems just and proper.

17

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

## COUNT III
## Common Law Fraud
### (against Chen Neal and Pulwer)

94.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 of this complaint as if fully restated herein.

95.     Chen Neal, by and through Pulwer, made false and misleading representations of fact (or omissions) to Plaintiffs prior to Plaintiffs entry into the SPA (including regarding the Special Knowledge), which Chen Neal and Pulwer knew or should have known to be false and misleading at the time they were made.

96.     Chen Neal and Pulwer made the false and misleading representations of fact (or omissions), including regarding the Special Knowledge, for the purpose of inducing Plaintiffs to act in reliance thereon and Plaintiffs did rely on the representations (or omissions) when executing the SPA.

97.     Chen Neal and Pulwer had a duty to disclose this information to the Plaintiffs, including due to their Special Knowledge and his fiduciary position.

98.     After the execution of the SPA, Chen Neal and Pulwer made the false and misleading representations of fact (or omissions), including regarding the Special Knowledge, for the purpose of inducing Plaintiffs to act in reliance thereon and Plaintiffs did rely on the representations by closing on the SPA.

99.     As a result, Plaintiffs have suffered damages.

100.    Pulwer and Chen Neal had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result, and despite that knowledge, intentionally pursued that course of conduct, resulting in Plaintiffs injury or damage.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**WHEREFORE**, the Plaintiffs respectfully request that the Court award, against Pulwer and in favor of the Plaintiffs, a judgment including damages as follows: (i) compensatory damages for all damages the Plaintiffs sustained as a result of Pulwer's wrongdoing in connection with the Plaintiffs' sale of their DBRM stock in an amount to be proven at trial, plus applicable pre-judgment interest thereon at the greatest legal rate; (ii) the reasonable costs and expenses, including attorney's fees, incurred in this action, to the extent permissible by law; (iii) punitive or exemplary damages in the greatest amount found by the jury; and (iv) all such other and further relief as the Court deems just and proper.

<u>**COUNT IV**</u>
**Unjust Enrichment**
(against Chen Neal LLC and Pulwer)

101.     The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 of this complaint as if fully restated herein.

102.     Plaintiffs have conferred a benefit upon the Pulwer and Chen Neal, by transferring their interests in DBRM to Pulwer and Chen Neal.

103.     Chen Neal and Pulwer had knowledge of the benefit, and accepted the benefit conferred upon them from the Plaintiffs.

104.     As set forth above, Chen Neal and Pulwer received a benefit of $65,000.00 per share, while they have paid the Plaintiffs only $20,000.00 per share.

105.     It would be wholly inequitable to allow Chen Neal and Pulwer to retain said benefits without payment to the Plaintiffs for the benefits received.

106.     Plaintiffs have no adequate remedy at law.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

**WHEREFORE**, Plaintiff prays this Court will enter judgment against Chen Neal and Pulwer, for compensatory damages, pre-judgment and post-judgment interest, costs, and such further relief as this Court deems just and proper.

<u>**COUNT V**</u>
**Fraud in the Inducement**
(against Chen Neal LLC and Pulwer)

107.    The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 of this complaint as if fully restated herein.

108.    Chen Neal, by and through Pulwer, made false and misleading representations of fact (or omissions) to Plaintiffs prior to Plaintiffs entry into the SPA, which Chen Neal and Pulwer knew or should have known to be false and misleading at the time they were made.

109.    Chen Neal and Pulwer made the false representations or misleading omissions for the purpose of inducing Plaintiffs to act in reliance thereon and Plaintiffs did rely on the representations when executing the SPA.

110.    As a result, Plaintiffs have suffered damages.

111.    Pulwer and Chen Neal had actual knowledge of the wrongfulness of its conduct and the high probability that injury or damage to the Plaintiffs would result, and despite that knowledge, intentionally pursued that course of conduct, resulting in Plaintiffs injury or damage.

**WHEREFORE**, the Plaintiffs respectfully request that the Court award, against Pulwer and in favor of the Plaintiffs, a judgment including damages as follows: (i) compensatory damages for all damages the Plaintiffs sustained as a result of Pulwer's wrongdoing in connection with the Plaintiffs' sale of their DBRM stock in an amount to be proven at trial, plus applicable pre-judgment interest thereon at the greatest legal rate; (ii) the reasonable costs and expenses, including attorney's fees, incurred in this action, to the extent permissible by law; (iii)

punitive or exemplary damages in the greatest amount found by the jury; and (iv) all such other and further relief as the Court deems just and proper.

## COUNT VI
### Constructive Trust
(against Chen Neal LLC and Pulwer)
(as an additional remedy if the Court enters judgment on Count II, III, IV or V)

112.    The Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 of this complaint as if fully restated herein.

113.    The Plaintiffs placed trust and confidence in Pulwer, and in his advice, information and representations, due to their several years of close friendship, the pattern of conduct between them, Pulwer's control of and over DBRM, including its financials, and Pulwer's organization and dissemination of financial information (including the Annual Financial Statements) to the Plaintiffs.  Pulwer accepted this role.

114.    Indeed, Pulwer willingly accepted and responded to the Plaintiffs' requests for advice and direction as to DBRM.

115.    Such conduct constituted an express or implied promise to provide accurate and timely information to the Plaintiffs concerning DBRM.

116.    Such a relationship was a confidential relationship.

117.    Pulwer intentionally or recklessly:

- Misrepresented or omitted material information to the Plaintiffs as to the value of DBRM and DBRM stock in view of his Special Knowledge, and the Plaintiffs' ignorance as to the Special Knowledge;

- Failed to disclose his intentions, plans and communications to sell DBRM or the Property;

- Failed or omitted to provide accurate advice or information to the Plaintiffs upon learning or knowing that DBRM's primary asset, the Property, was of increased interest to buyers in the marketplace; and

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

- Manipulated and induced the Plaintiffs to sell their DBRM stock at prices known to Pulwer to be grossly understated;

all with the purpose to financially benefit himself to the detriment of the Plaintiffs.

118.    As set forth above, Chen Neal and Pulwer received a benefit of $65,000.00 per share, while they have paid the Plaintiffs only $20,000.00 per share.

119.    In reliance on these promises, misrepresentation and/or omissions, Plaintiffs transferred property.

120.    Pulwer and Chen Neal have been unjustly enriched.

WHEREFORE, Plaintiffs request that this Court impose a constructive trust on the proceeds of the CG Sale, for the benefit of the Plaintiffs, and grant such other relief as is just and equitable.

Plaintiffs request a jury trial on all issues so triable.

Dated: November 14, 2014.

s/ Peter D. Russin_____
Peter D. Russin, Esquire
Florida Bar No. 765902
prussin@melandrussin.com
Lawrence E. Pecan, Esq.
Florida Bar No. 99086
lpecan@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
200 South Biscayne Boulevard, Suite 3200
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221
*Attorneys for Plaintiff*

.

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2003

| | | |
|---|---|---:|
| Agreed Upon Distribution 2003 | | 30,000.00 |
| Deduct: | Bank Service Charges | (342.79) |
| | Licenses | (75.00) |
| | Professional Fees | (1,189.75) |
| | Florida Intangible Tax | (304.00) |
| Amount Available for Distributions | | 28,088.46 |
| 2003 Previous Distributions | | (21,600.00) |
| Amount to be Distributed 4th Quarter | | 6,488.46 |

| Shareholder | % Owned | 2003 Total Distributions | 2003 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 11,235.36 | 8,640.00 | 2,595.36 |
| James Resnick | 30.00% | 8,426.55 | 6,480.00 | 1,946.55 |
| Steven Resnick | 10.00% | 2,808.85 | 2,160.00 | 648.85 |
| Andrew Resnick | 10.00% | 2,808.85 | 2,160.00 | 648.85 |
| Larry Feingold | 10.00% | 2,808.85 | 2,160.00 | 648.85 |
| Totals | 100.00% | 28,088.46 | 21,600.00 | 6,488.46 |

EXHIBIT A

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2004

| | | |
|---|---|---:|
| Agreed Upon Distribution 2004 | | 31,200.00 |
| Deduct: | Bank Service Charges | (328.90) |
| | Licenses | (225.00) |
| | Professional Fees | (1,150.00) |
| | Florida Intangible Tax | (84.00) |
| Amount Available for Distributions | | 29,412.10 |
| 2004 Previous Distributions | | (23,400.00) |
| Amount to be Distributed 4th Quarter | | 6,012.10 |

| Shareholder | % Owned | 2004 Total Distributions | 2004 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 11,764.84 | 9,360.00 | 2,404.84 |
| James Resnick | 30.00% | 8,823.63 | 7,020.00 | 1,803.63 |
| Steven Resnick | 10.00% | 2,941.21 | 2,340.00 | 601.21 |
| Andrew Resnick | 10.00% | 2,941.21 | 2,340.00 | 601.21 |
| Larry Feingold | 10.00% | 2,941.21 | 2,340.00 | 601.21 |
| Totals | 100.00% | 29,412.10 | 23,400.00 | 6,012.10 |

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2005

|  |  |  |
|---|---|---:|
| Agreed Upon Distribution 2005 |  | 32,400.00 |
| Deduct: | Bank Service Charges | (209.60) |
|  | Licenses | (225.00) |
|  | Professional Fees | (1,150.00) |
|  | Florida Intangible Tax | (84.00) |
| Amount Available for Distributions |  | **30,731.40** |
| 2005 Previous Distributions |  | (24,300.00) |
| Amount to be Distributed 4th Quarter |  | 6,431.40 |

| Shareholder | % Owned | 2005 Total Distributions | 2005 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 12,292.56 | 9,720.00 | 2,572.56 |
| James Resnick | 30.00% | 9,219.42 | 7,290.00 | 1,929.42 |
| Steven Resnick | 10.00% | 3,073.14 | 2,430.00 | 643.14 |
| Andrew Resnick | 10.00% | 3,073.14 | 2,430.00 | 643.14 |
| Larry Feingold | 10.00% | 3,073.14 | 2,430.00 | 643.14 |
| **Totals** | **100.00%** | **30,731.40** | **24,300.00** | **6,431.40** |

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2003

| | | |
|---|---|---:|
| Agreed Upon Distribution 2003 | | 30,000.00 |
| Deduct: | Bank Service Charges | (342.79) |
| | Licenses | (75.00) |
| | Professional Fees | (1,189.75) |
| | Florida Intangible Tax | (304.00) |
| Amount Available for Distributions | | **28,088.46** |
| 2003 Previous Distributions | | (21,600.00) |
| Amount to be Distributed 4th Quarter | | 6,488.46 |

| Shareholder | % Owned | 2003 Total Distributions | 2003 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 11,235.36 | 8,640.00 | 2,595.36 |
| James Resnick | 30.00% | 8,426.55 | 6,480.00 | 1,946.55 |
| Steven Resnick | 10.00% | 2,808.85 | 2,160.00 | 648.85 |
| Andrew Resnick | 10.00% | 2,808.85 | 2,160.00 | 648.85 |
| Larry Feingold | 10.00% | 2,808.85 | 2,160.00 | 648.85 |
| Totals | 100.00% | 28,088.46 | 21,600.00 | 6,488.46 |

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2004

| | | |
|---|---|---|
| Agreed Upon Distribution 2004 | | 31,200.00 |
| Deduct: | Bank Service Charges | (328.90) |
| | Licenses | (225.00) |
| | Professional Fees | (1,150.00) |
| | Florida Intangible Tax | (84.00) |
| Amount Available for Distributions | | 29,412.10 |
| 2004 Previous Distributions | | (23,400.00) |
| Amount to be Distributed 4th Quarter | | 6,012.10 |

| Shareholder | % Owned | 2004 Total Distributions | 2004 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 11,764.84 | 9,360.00 | 2,404.84 |
| James Resnick | 30.00% | 8,823.63 | 7,020.00 | 1,803.63 |
| Steven Resnick | 10.00% | 2,941.21 | 2,340.00 | 601.21 |
| Andrew Resnick | 10.00% | 2,941.21 | 2,340.00 | 601.21 |
| Larry Feingold | 10.00% | 2,941.21 | 2,340.00 | 601.21 |
| Totals | 100.00% | 29,412.10 | 23,400.00 | 6,012.10 |

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2005

| | | |
|---|---|---:|
| Agreed Upon Distribution 2005 | | 32,400.00 |
| Deduct: | Bank Service Charges | (209.60) |
| | Licenses | (225.00) |
| | Professional Fees | (1,150.00) |
| | Florida Intangible Tax | (84.00) |
| Amount Available for Distributions | | **30,731.40** |
| 2005 Previous Distributions | | (24,300.00) |
| Amount to be Distributed 4th Quarter | | 6,431.40 |

| Shareholder | % Owned | 2005 Total Distributions | 2005 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 12,292.56 | 9,720.00 | 2,572.56 |
| James Resnick | 30.00% | 9,219.42 | 7,290.00 | 1,929.42 |
| Steven Resnick | 10.00% | 3,073.14 | 2,430.00 | 643.14 |
| Andrew Resnick | 10.00% | 3,073.14 | 2,430.00 | 643.14 |
| Larry Feingold | 10.00% | 3,073.14 | 2,430.00 | 643.14 |
| Totals | **100.00%** | **30,731.40** | **24,300.00** | **6,431.40** |

Down by river

2005 Rent

$ 2700.00 monthly $\Big\}$ $\Big\}$ $ 8360.00
plus tax $660.00 $ $ $ $ 400.00 extra
$\overline{$3760.00}$

Quartely Disbursements

2700 x 3 = $ 8100.00

Jimmy Resnick — 30%
Andrew " — 10%
Steven " — 10%
Larry Feingold — 10%
Michael Pulwer — 40%

James Resnick ——— $ 2430.00
Andrew " ——— $ 810.00
Steven " ——— $ 810.00
Larry Feingold ——— $ 810.00
Michael Pulwer ——— $ 3240.00
$\overline{$ 8100.00}$

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2006

| | | |
|---|---|---:|
| Agreed Upon Distribution 2006 | | 33,600.00 |
| Deduct: | Bank Service Charges | (436.75) |
| | Licenses | (255.00) |
| | Professional Fees | (1,000.00) |
| | Florida Intangible Tax | 0.00 |
| Amount Available for Distributions | | 31,908.25 |
| 2006 Previous Distributions | | (25,200.00) |
| Amount to be Distributed 4th Quarter | | 6,708.25 |

| Shareholder | % Owned | 2006 Total Distributions | 2006 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 12,763.28 | 10,080.00 | 2,683.28 |
| James Resnick | 30.00% | 9,572.48 | 7,560.00 | 2,012.48 |
| Steven Resnick | 10.00% | 3,190.83 | 2,520.00 | 670.83 |
| Andrew Resnick | 10.00% | 3,190.83 | 2,520.00 | 670.83 |
| Larry Feingold | 10.00% | 3,190.83 | 2,520.00 | 670.83 |
| Totals | 100.00% | 31,908.25 | 25,200.00 | 6,708.25 |

# DOWNBYRIVER MIAMI, INC.
## ANNUAL DISTRIBUTIONS 2007

| | | |
|---|---|---:|
| Agreed Upon Distribution 2007 | | 34,800.00 |
| Deduct: | Bank Service Charges | (140.00) |
| | Licenses | (275.00) |
| | Professional Fees | (1,000.00) |
| Amount Available for Distributions | | **33,385.00** |
| 2007 Previous Distributions | | (22,620.00) |
| Amount to be Distributed 4th Quarter | | 10,765.00 |

| Shareholder | % Owned | 2007 Total Distributions | 2007 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 13,354.00 | 6,960.00 | 6,394.00 |
| James Resnick | 30.00% | 10,015.50 | 7,830.00 | 2,185.50 |
| Steven Resnick | 10.00% | 3,338.50 | 2,610.00 | 728.50 |
| Andrew Resnick | 10.00% | 3,338.50 | 2,610.00 | 728.50 |
| Larry Feingold | 10.00% | 3,338.50 | 2,610.00 | 728.50 |
| Totals | **100.00%** | **33,385.00** | **22,620.00** | **10,765.00** |

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2008

| | |
|---|---|
| Agreed Upon Distribution 2008 | 36,000.00 |
| Deduct: Bank Service Charges | (84.00) |
| Licenses | (275.00) |
| Professional Fees | (1,000.00) |
| Amount Available for Distributions | 34,641.00 |
| 2008 Previous Distributions | (16,200.00) |
| Amount to be Distributed 4th Quarter | 18,441.00 |

| Shareholder | % Owned | 2008 Total Distributions | 2008 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 13,856.40 | 0.00 | 13,856.40 |
| James Resnick | 30.00% | 10,392.30 | 8,100.00 | 2,292.30 |
| Steven Resnick | 10.00% | 3,464.10 | 2,700.00 | 764.10 |
| Andrew Resnick | 10.00% | 3,464.10 | 2,700.00 | 764.10 |
| Larry Feingold | 10.00% | 3,464.10 | 2,700.00 | 764.10 |
| Totals | 100.00% | 34,641.00 | 16,200.00 | 18,441.00 |

$3000.00 monthly   $3810.00
plus tax  $810.00    390.00 extra
                    _____
                    $4200.00

Quartely Disbursements

$3000.00 × 3 = $9000.00

Jimmy Resnick — 30 %
Andrew      "    — 10 %
Steve       "    — 10 %
Larry Feingold   — 10 %
Michael Polwer   — 40 %

James Resnick ———— $2700.00
Andrew     "   ———— $ 900.00
Steve      "   ———— $ 900.00
Larry Feingold ———— $ 900.00
Michael Polwer ———— $3600.00
                    _____
               $  9000.00

4-25-08

$ 3000.00   monthly  }   $ 3 810.00
plus tax   $ 810.00  }      390.00   extra
                          ─────────
                        $ 4200.00

4P.

Quartely Disbursements

3000.00 × 3 = $ 9000.00

Jimmy Resnick — 30 %
Andrew        "   — 10 %
Steven        "   — 10 %
Larry Feingold    — 10 %
Michael Pulwer    — 40 %

James Resnick  ─────  $ 2700.00
Andrew      "  ─────  $  900.00
Steven      "  ─────  $  900.00
Larry Feingold ─────  $  900.00
Michael Pulwer ─────  $ 3600.00
                      ──────────
                  $   9 000.00

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2009

| | | |
|---|---|---:|
| Agreed Upon Distribution 2009 | | 37,800.00 |
| Deduct: | Bank Service Charges | (104.00) |
| | Licenses | (325.00) |
| | Professional Fees | (1,000.00) |
| Amount Available for Distributions | | 36,371.00 |
| 2009 Previous Distributions | | (17,010.00) |
| Amount to be Distributed 4th Quarter | | 19,361.00 |

| Shareholder | % Owned | 2009 Total Distributions | 2009 Previously Distributed | 4th Qtr. Remaining Distributions | | |
|---|---|---|---|---|---|---|
| Michael Pulwer | 40.00% | 14,548.40 | 0.00 | 14,548.40 ✓ | 1422 | |
| James Resnick | 30.00% | 10,911.30 | 8,505.00 | 2,406.30 ✓ | 1418 | |
| Steven Resnick | 10.00% | 3,637.10 | 2,835.00 | 802.10 ✓ | 1419 | 12-31-09 |
| Andrew Resnick | 10.00% | 3,637.10 | 2,835.00 | 802.10 ✓ | 14 20 | |
| Larry Feingold | 10.00% | 3,637.10 | 2,835.00 | 802.10 ✓ | 1421 | |
| Totals | 100.00% | 36,371.00 | 17,010.00 | 19,361.00 | | |

**DOWNBYRIVER MIAMI, INC.**
**RENT 2009**
**TENTH YEAR**

**$3,150.00 PLUS $900.00 TAXES PLUS 400.00 EXTRA = $4,450.00  MONTHLY**

**QUARTELY DISBURSEMENTS**

**$3,150.00  X  3  =  $9,450.00**

| | |
|---|---|
| **JAMES RESNICK** | **30%** |
| **ANDREW RESNICK** | **10%** |
| **STEVEN RESNICK** | **10%** |
| **LAURENCE FEINGOLD** | **10%** |
| **MICHAEL PULWER** | **40%** |

**JAMES RESNICK**………………………………………..**$2,835.00**

**ANDREW RESNICK**…………………………………… **$945.00**

**STEVEN RESNICK**…………………………………….. **$945.00**

**LAURENCE FEINGOLD**……………………………… **$945.00**

**MICHAEL PULWER**…………………………………. **$3780.00**

**TOTAL**……………………………………………….. **$9,450.00**

# DOWNBYRIVER MIAMI, INC.
## RENT 2010
## ELEVENTH YEAR

**$3,150.00 PLUS $900.00 TAXES PLUS 400.00 EXTRA = $4,450.00  MONTHLY**

### QUARTELY DISBURSEMENTS

**$3,150.00  X  3  =  $9,450.00**

| | |
|---|---|
| JAMES RESNICK | 30% |
| ANDREW RESNICK | 10% |
| STEVEN RESNICK | 10% |
| LAURENCE FEINGOLD | 10% |
| MICHAEL PULWER | 40% |

JAMES RESNICK..............................................$2,835.00

ANDREW RESNICK.......................................... $945.00

STEVEN RESNICK.......................................... $945.00

LAURENCE FEINGOLD................................... $945.00

MICHAEL PULWER......................................... $3780.00

TOTAL........................................... $9,450.00

# DOWNBYRIVER MIAMI, INC.

## ANNUAL DISTRIBUTIONS 2010

| | | |
|---|---|---:|
| Agreed Upon Distribution 2010 | | 37,800.00 |
| Deduct: | Bank Service Charges | (50.00) |
| | Licenses | (325.00) |
| | Professional Fees | (1,000.00) |
| Amount Available for Distributions | | **36,425.00** |
| 2010 Previous Distributions | | (17,010.00) |
| Amount to be Distributed 4th Quarter | | 19,415.00 |

| Shareholder | % Owned | 2010 Total Distributions | 2010 Previously Distributed | 4th Qtr. Remaining Distributions |
|---|---|---|---|---|
| Michael Pulwer | 40.00% | 14,570.00 | 0.00 | 14,570.00 |
| James Resnick | 30.00% | 10,927.50 | 8,505.00 | 2,422.50 |
| Steven Resnick | 10.00% | 3,642.50 | 2,835.00 | 807.50 |
| Andrew Resnick | 10.00% | 3,642.50 | 2,835.00 | 807.50 |
| Larry Feingold | 10.00% | 3,642.50 | 2,835.00 | 807.50 |
| Totals | **100.00%** | **36,425.00** | **17,010.00** | **19,415.00** |

Form **8825**
(Rev December 2010)

Department of the Treasury
Internal Revenue Service

## Rental Real Estate Income and Expenses of a Partnership or an S Corporation

► See instructions.
► Attach to Form 1065, Form 1065-B, or Form 1120S.

OMB No. 1545-1186

Name **DOWNBYRIVER MIAMI, INC.**

Employer Identification number **65-0935589**

**1** Show the type and address of each property. For each rental real estate property listed, report the number of days rented at fair rental value and days with personal use. See instructions. See page 2 to list additional properties.

| | Physical address of each property — street, city, state, ZIP code | Type — Enter code 1-8; see page 2 for list | Fair Rental Days | Personal Use Days |
|---|---|---|---|---|
| **A** | | | | |
| **B** | | | | |
| **C** | | | | |
| **D** | | | | |

| Rental Real Estate income | | Properties | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **2** Gross rents | **2** | 50,181. | | | |
| **Rental Real Estate Expenses** | | | | | |
| **3** Advertising | **3** | | | | |
| **4** Auto and travel | **4** | | | | |
| **5** Cleaning and maintenance | **5** | | | | |
| **6** Commissions | **6** | | | | |
| **7** Insurance | **7** | 10,470. | | | |
| **8** Legal and other professional fees | **8** | | | | |
| **9** Interest | **9** | 12,668. | | | |
| **10** Repairs | **10** | | | | |
| **11** Taxes | **11** | 23,715. | | | |
| **12** Utilities | **12** | | | | |
| **13** Wages and salaries | **13** | | | | |
| **14** Depreciation (see instructions) | **14** | 13,334. | | | |
| **15** Other (list) ► Amortization | **15** | 434. | | | |
| Bank Service Charges | | 50. | | | |
| Dues & Subscriptions | | 200. | | | |
| **16** Total expenses for each property. Add lines 3 through 15 | **16** | 60,871. | | | |
| **17** Income or (Loss) from each property. Subtract line 16 from line 2 | **17** | -10,690. | | | |

| | | | |
|---|---|---|---|
| **18a** Total gross rents. Add gross rents from line 2, columns A through H | | **18a** | 50,181. |
| **18b** Total expenses. Add total expenses from line 16, columns A through H | | **18b** | -60,871. |
| **19** Net gain (loss) from Form 4797, Part II, line 17, from the disposition of property from rental real estate activities | | **19** | |
| **20a** Net income (loss) from rental real estate activities from partnerships, estates, and trusts in which this partnership or S corporation is a partner or beneficiary (from Schedule K-1) | | **20a** | |

**b** Identify below the partnerships, estates, or trusts from which net income (loss) is shown on line 20a. Attach a schedule if more space is needed:

| (1) Name | (2) Employer identification number |
|---|---|
| | |
| | |

| | | |
|---|---|---|
| **21** Net rental real estate income (loss). Combine lines 18a through 20a. Enter the result here and on: | **21** | -10,690. |
| • Form 1065 or 1120S: Schedule K, line 2, or | | |
| • Form 1065-B: Part I, line 4 | | |

**BAA** For Paperwork Reduction Act Notice, see the separate instructions.

SPSZ0101 01/06/11

Form **8825** (12-2010)

DOWNRIVER MIAMI, INC.
RENT 2010
**ELEVENTH YEAR**

$3,150.00 PLUS $900.00 TAXES PLUS 400.00 EXTRA = $4,450.00  MONTHLY

QUARTELY DISBURSEMENTS

$3,150.00  X  3  =  $9,450.00

| | |
|---|---|
| JAMES RESNICK | 30% |
| ANDREW RESNICK | 10% |
| STEVEN RESNICK | 10% |
| LAURENCE FEINGOLD | 10% |
| MICHAEL PULWER | 40% |

JAMES RESNICK...............................................$2,835.00

ANDREW RESNICK......................................... $945.00

STEVEN RESNICK.......................................... $945.00

LAURENCE FEINGOLD................................... $945.00

MICHAEL PULWER......................................... . $3780.00

TOTAL........................................................... $9,450.00

# DOWNBYRIVER MIAMI, INC.
## ANNUAL DISTRIBUTIONS 2010

| | |
|---|---:|
| Agreed Upon Distribution 2010 | 37,800.00 |
| Deduct:   Bank Service Charges | (50.00) |
| Licenses | (325.00) |
| Professional Fees | (1,000.00) |
| Amount Available for Distributions | 36,425.00 |
| 2010 Previous Distributions | (17,010.00) |
| Amount to be Distributed 4th Quarter | 19,415.00 |



| Shareholder | % Owned | 2010 Total Distributions | 2010 Previously Distributed | 4th Qtr. Remaining Distributions | |
|---|---|---|---|---|---|
| Michael Pulwer | 40.00% | 14,570.00 | 0.00 | 14,570.00 — 1442 | |
| James Resnick | 30.00% | 10,927.50 | 8,505.00 | 2,422.50 — 1443 | |
| Steven Resnick | 10.00% | 3,642.50 | 2,835.00 | 807.50 — 1444 | 3/2/11 |
| Andrew Resnick | 10.00% | 3,642.50 | 2,835.00 | 807.50 — 1445 | |
| Larry Feingold | 10.00% | 3,642.50 | 2,835.00 | 807.50 — 1446 | |
| Totals | 100.00% | 36,425.00 | 17,010.00 | 19,415.00 | |

# DOWNBYRIVER MIAMI, INC.
## RENT 2011
## TWELVE YEAR

$3,150.00 PLUS $900.00 TAXES PLUS 400.00 EXTRA = $4,450.00  MONTHLY

QUARTELY DISBURSEMENTS

$3,150.00  X  3  =  $9,450.00

| | |
|---|---|
| JAMES RESNICK | 30% |
| ANDREW RESNICK | 10% |
| STEVEN RESNICK | 10% |
| LAURENCE FEINGOLD | 10% |
| MICHAEL PULWER | 40% |

JAMES RESNICK...............................................$2,835.00

ANDREW RESNICK.......................................... $945.00

STEVEN RESNICK........................................... $945.00

LAURENCE FEINGOLD..................................... $945.00

MICHAEL PULWER........................................ . $3780.00

TOTAL........................................................ $9,450.00

**From:** Kent H. Robbins - KHR Law Offices [mailto:khr@Khrlawoffices.com]
**Sent:** Tuesday, December 17, 2013 6:13 PM
**To:** Jon Beloff
**Cc:** Ernesto Reyes - KHR Law Offices; Jimmy Resnick
**Subject:** RE: amendment of agreement from Resnick et al to Chen Neal LLC

Jon
Please arrange for Jimmy and his mishpuha to sign the agreement.
Kent

***Kent Harrison Robbins***
Attorney at Law

 The Law Offices of Kent Harrison Robbins

1224 Washington Avenue
Miami Beach, Florida 33139

1

Exhibit B

**From:** Gmail <mspulwer@gmail.com>
**Date:** August 10, 2014 at 7:41:33 AM EDT
**To:** Jimmy <jimmyresnick@hotmail.com>
**Subject: Re: Downbyriver**

Good morning. I caught a bad cold and have basically tried to relax and get better. Will let u know when we can meet. Thanks

Sent from my iPhone

On Aug 7, 2014, at 11:32 AM, Jimmy <jimmyresnick@hotmail.com> wrote:

Tomorrow anytime after 3

Sent from my iPad

On Aug 7, 2014, at 11:03 AM, "Gmail" <mspulwer@gmail.com> wrote:

Hi Jimmy
Not looking good to meet today. How is tomoro or next couple of days?

Sent from my iPhone

On Aug 3, 2014, at 7:20 PM, Jimmy <jimmyresnick@hotmail.com> wrote:

Ok let me know when

Sent from my iPhone

On Aug 3, 2014, at 7:16 PM, "Gmail" <mspulwer@gmail.com> wrote:

I might not b available till Thurs at which point we could meet anytime. If something changes and I can do it sooner, I will let u know. I look forward to seeing u.

Sent from my iPhone

On Aug 3, 2014, at 5:51 PM, Jimmy <jimmyresnick@hotmail.com> wrote:

When and where?

Sent from my iPad

On Aug 3, 2014, at 3:10 PM, "Gmail" <mspulwer@gmail.com> wrote:

Not true at all. If u would like to discuss face to face we can do so

Sent from my iPhone

Exhibit C

On Aug 3, 2014, at 1:17 PM, Jimmy <jimmyresnick@hotmail.com> wrote:

Besides being your partner for over 15 years, I consider you a close friend. I'm perplexed that you have chosen not to return my calls,emails and texts. I can only surmise that you aren't comfortable with what transpired with the sale of the property as it pertains to you and my family.

Sent from my iPad