# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

CASE NO.: 1:14-cv-24347/MORENO

JAMES RESNICK, LIDIA RESNICK,
STEVEN RESNICK, ELIZABETH
RESNICK, and GREEN ARM FAMILY,
L.P.,

      Plaintiffs,

v.

CHEN NEAL, LLC, a Delaware Limited
Liability Company, and MICHAEL
PULWER, an Individual,

      Defendants.

_____/

## DEFENDANTS' MOTION TO DISMISS COMPLAINT
## AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), Defendants Chen Neal, LLC ("Chen Neal") and Michael Pulwer ("Pulwer" and together with Chen Neal, "Defendants"), hereby move to dismiss with prejudice Plaintiff's Complaint.

## PRELIMINARY STATEMENT

Plaintiffs and Defendants are former co-shareholders in a closely held corporation ("Corporation" or "DBRM") they created to purchase a parcel of property located near the Miami River ("Property"). In September 2013, Plaintiffs sold their DBRM shares to Pulwer. Plaintiffs now sue Defendants for fraud in violation of Rule 10(b)-5 and section 10(b)-5 of the United States Securities Laws, breach of fiduciary duty, common law fraud, unjust enrichment, fraud in the inducement, and constructive trust.

Each of Plaintiffs' claims is predicated on the contention that at the time Chen Neal purchased Plaintiffs' stock Pulwer possessed "special knowledge" that the DBRM stock was

worth more than the $1 million Plaintiffs agreed to accept.  According to Plaintiffs, Pulwer knew that certain real estate agents had "preliminarily secured" an assemblage of properties along the Miami River and had "intended" to include the Property in the assemblage.  Plaintiffs allege the "associated effect" of this "marketplace interest" increased the Property value.  Plaintiffs thus conclude that Pulwer had a duty to share his "special knowledge" of the Property's "new" worth with Plaintiffs prior to purchasing their stock, and by failing to do so, Pulwer committed securities fraud.

Plaintiffs' 10b-5 claim, and in turn, each of its state law claims, fail on multiple levels.  Under the Supreme Court's seminal decision in *Dura Pharmaceuticals*, a 10b-5 plaintiff must set forth sufficient ultimate facts to show that it incurred a monetary loss and that the loss was suffered as a direct result of the defendant's alleged misstatement or omission.

Plaintiffs' 10b-5 claim fails from the outset because they do not and cannot show they suffered any loss.  As support for their argument that they suffered "millions of dollars in damages," Plaintiffs state that "the value of the Property, and by extension, the value of the shares in DBRM, had increased."  (Cmpl. ¶¶57, 86).   But Plaintiff provides no facts demonstrating that on the date of the stock sale, the Property was worth one penny more than what Pulwer paid.

To the contrary, Plaintiffs' "increased value" contention is predicated on nothing more than assumptions and speculation regarding possible future happenings.  Indeed, taking each of Plaintiffs' allegations as true, the fact that a real estate agent *"preliminary secured"* an assemblage, *"intended* to broker the sale of the Property", and "contacted" Pulwer regarding the the Property's *possible* inclusion in a *potential* assemblage, did not increase the Property's market value at the time the stock sale took place.  And because Plaintiffs' contention that they

received an "undervalued" price for their stock is based entirely on the notion that the Property's value increased, Plaintiffs cannot claim to have incurred any economic loss.

Without an economic loss, Plaintiffs cannot possibly plead loss causation and reliance in accordance with the requirements set forth in *Dura Pharmaceuticals*.

For this same reason, Plaintiffs fail to allege the "strong inference" of scienter required under the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509-10 (2007). Indeed, according to the allegations of the Complaint, it is not possible to conclude that Pulwer had any mal intent. If the Property did not increase in value at the time of the stock sale then, by definition, Pulwer had no "special knowledge" and no intent to deceive.

The lack of facts substantiating Plaintiffs' "increased value" contention similarly mandates dismissal of Plaintiffs' state law claims for common law fraud, unjust enrichment, fraud in the inducement and constructive trust.

Finally, Plaintiffs fail to allege that Pulwer, a minority shareholder of DBRM, owed Plaintiffs any fiduciary duty.

## MEMORANDUM OF LAW

### I.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests whether the plaintiff has pled sufficient facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In assessing the motion, the Court must dismiss a complaint that "fails to adequately link a cause of action to its factual

predicates," *Karhu v. Vital Pharm., Inc.*, No. 13-60768-CIV, 2013 WL 4047016, at *3 (S.D. Fla. Aug. 9, 2013) (internal quotation marks omitted).

Moreover, to survive a motion to dismiss a securities fraud complaint, a plaintiff must satisfy the requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").[1] *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237-38 (11th Cir. 2008).

Rule 9(b) requires that a plaintiff set forth *with particularity* "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1286-87 (S.D. Fla. 2011) (citations omitted).   Thus, Plaintiff must specify the "who, what, when, where, and how" of the alleged fraud." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citations omitted).   The particularity requirement "serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)

---

[1] The heightened pleading requirement of the PSLRA apply in individual 10b-5 actions. *Bamert v. Pulte Home Corp.*, No., 08-cv-2120, 2012 WL 3292397, *8 (M.D. Fla. June 11, 2012); *See also Scaturro v. Seminole Cas. Ins. Co.*, 542 F. Supp. 2d 1290, 1298 (S.D. Fla. 2008) (Huck, J.) (dismissing Rule 10(b)-5 claims brought by minority shareholders of closely held corporations); *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283 (Fla. S.D. 2007) (King, J.) (dismissing Rule 10(b)-5 claim brought by individual purchasers of condominium units against developer and real estate agents); *Chiarenza v. IBSG Intern., Inc.*, No. 09-22736-CIV, 2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) (Seitz, J.) (dismissing non-class Rule 10(b)-5 claim by stockholder against auditing firm).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

(citation omitted).   Because each of Plaintiff's state law claims sound in fraud, they are also subject to the heightened pleading requirement of Rule 9(b).[2]

The PSLRA provides that "[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.A. § 78u–4(b)(1).   If these pleading requirements are not satisfied, the Court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).[3]

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.   Plaintiffs' Rule 10b-5 Claim Must Be Dismissed Because Plaintiffs Have Not and Cannot Allege the Required Elements of Economic Loss, Loss Causation, Scienter, and Reliance

"To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter—a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation,

---

[2] *See Oginsky v. Paragon Props. of Costa Rica LLC,* 784 F. Supp. 2d 1353, 1368 (S.D. Fla. 2011) (dismissing claim for fraudulent inducement due to lack of specificity as required by Rule 9(b)); *Space Coast Credit Union v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 295 F.R.D. 540, 545 (S.D. Fla. 2013) (applying Rule 9 pleading requirements to unjust enrichment claim based on alleged fraudulent representations and omissions); *Rogers v. Cisco Systems, Inc.* 268 F. Supp. 2d 1305, 1310 (N.D. Fla. 2003) (applying Rule 9(b) to claims for breach of fiduciary duty based on alleged fraudulent scheme); *Rogers v. Cisco Systems, Inc.* 268 F. Supp. 2d 1305, 1310 (N.D. Fla. 2003) (applying Rule 9(b) to breach of fiduciary duty claim based on alleged fraudulent scheme).
[3] The PSLRA was enacted in 1995 to insure the disposition of baseless claims before a defendant is forced to engage in expensive, protracted discovery." *Scaturro v. Seminole Cas. Ins. Co.,* 542 F. Supp. 2d 1290, 1298 (S.D. Fla. 2008) (citing *Rhodes v. Omega Research, Inc.,* 38 F. Supp. 2d 1353, 1358 (S.D.Fla.1999)).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

i.e., a causal connection between the material misrepresentation and the loss." *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013) (quotation omitted).

Plaintiffs' Complaint falls far short of these pleading requirements.

### 1.   Plaintiffs' Complaint Lacks Required Allegations of Economic Loss

Plaintiffs' claim for violation of Rule 10b-5 and section 10b-5 must be dismissed because Plaintiffs do not adequately allege the required element of "economic loss" as set forth by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005):

> The common law of deceit subjects a person who 'fraudulently' makes a 'misrepresentation' to liability 'for pecuniary loss caused' to one who justifiably relies upon that misrepresentation . . . ***And the common law has long insisted that a plaintiff in such case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss.***

544 U.S. at 343-44 (emphasis added, internal citations omitted).

The Eleventh Circuit has held that "[t]he proper measure of damages utilizes the out-of-pocket rule: the plaintiff can recover the difference between the price paid and the 'real' value of the security, *i.e.*, the fair market value absent the misrepresentations, at the time of the initial purchase by the defrauded buyer." *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997).

Plaintiffs allege they suffered "millions of dollars in damages" because they sold their stock to Pulwer at an "undervalued" price when "the value of the Property, and by extension, the value of the shares in DBRM, had increased." (Cmpl. ¶55). But Plaintiffs fail to provide any factual basis for their conclusory statement that on September 3, 2013 Plaintiffs' share of the Property was worth more than the $1 million that Plaintiffs asked Pulwer to pay.

Plaintiffs do not, for example, allege that at the time Pulwer purchased their shares: (1) the Property had already been sold; (2) a contract was signed for the purchase of the Property; or

(3) a letter of intent was in place for the purchase of the Property. Indeed, Plaintiffs do not allege that an offer was accepted by Pulwer for the purchase of the Property, or that an offer was even extended to Pulwer for the purchase of the property at that time.

Rather, the sole support Plaintiffs offer for their contention that the Property (and in turn Plaintiffs' stock) was "undervalued" is that, at the time of the stock sale, the Property was "of increased interest to buyers in the marketplace." (Cmpl. ¶77). Specifically, Plaintiffs rely on "now-published reports" purporting to quote real estate agent Chris Deitz:[4]

> [I]n early 2012 . . . I went down and started to scout areas where I could assemble property in close proximity of other upcoming developments. I proceeded to call over the next few months and secured a continuous assemblage of properties."

(Cmpl.¶54).

Notably, Plaintiffs do not elaborate on Deitz's purported statement in any respect. Most glaringly, Plaintiffs do not explain what "secured" means. For example, Plaintiffs do not allege that the properties were under contract or that there were any deals at all in place. In fact, Plaintiff alleges that Deitz only *"preliminarily"* secured a contiguous assemblage of real property," confirming that no binding agreements existed at the time of the stock sale. (Cmpl. ¶51).

In addition, Plaintiffs never allege that the Property was one of the properties Deitz "preliminarily secured." Indeed, the sole allegation in the Complaint attempting to connect the Property to the Deitz quote is as follows: "[a]s a part of this process, between 2012 and September 3, 2013, the RE Brokers contacted Pulwer as a representative of DBRM regarding purchasing the Property for inclusion in the Property Assemblage." (Id. *at* ¶53).

Putting aside that Plaintiffs offer not a single detail regarding the brokers' purported "contact" with Pulwer, the fact that real estate brokers may have (i) *"preliminarily* secured a

---

[4] This quote is taken verbatim from a newspaper article.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

contiguous assemblage" of property (*id.* at ¶51); (ii) "found" a *potential* buyer (*id.* at ¶52); (iii) "*intended* to broker the sale of the Property" (*id.* at ¶55); and (iv) "*contacted* Pulwer . . . regarding purchasing the Property" (*id.* at ¶53), cannot cause the Property to increase in value. These allegations are nothing more than maybes piled on top of contingencies insufficient to support a securities fraud claim. *See Kinnett v. Strayer Educ., Inc.,* 501 Fed. Appx. 890, 894 (11th Cir. 2012) ("unwarranted deductions of fact" are not admitted as true in a motion to dismiss.").

Defendants agree that if, at the time of the stock sale, a contract was in place for the sale of the Property to a third party at a higher price than Chen Neal paid, then Plaintiffs could argue the Property value increased. But Plaintiffs do not come close to alleging that. Rather, Plaintiffs' allegations provide nothing more than pure speculation regarding a possible opportunity for the future sale of the Property. Absent allegations that a written agreement existed between Pulwer and a third party for the sale of the Property at a specified price prior to the stock sale, Plaintiffs cannot establish that their shares were "undervalued."

It is also for this reason this Plaintiffs' focus on Chen Neal's subsequent sale of the Property is misplaced. The bottom line is that the fair market value of a piece of property at any given point in time is the price that a buyer agrees to pay for it at that exact moment in time. The fair market value of the Property on September 3, 2013 was $2 million—set by the $1 million that Plaintiffs demanded and Pulwer was willing to pay for their shares. The fact that Pulwer sold the property for $6.5 million *10 months after* the stock purchase agreement was signed is of no moment. It merely confirms that the Property was worth $6.5 million in July 2014.

Because Plaintiffs have failed to allege any economic loss, their claims must be summarily dismissed.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

2.      **Plaintiffs Cannot Allege the Required Elements of Loss Causation or Reliance**

If Plaintiffs cannot allege an economic loss, Plaintiffs cannot possibly plead the elements of loss causation or reliance. In *Robbins* the Eleventh Circuit held that a 10b-5 claim *"require[s] proof of a causal connection between the misrepresentation and the investments subsequent decline in value."* 116 F.3d at 1147-48 (emphasis added, internal citations omitted). "By ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that the federal securities laws do not 'become a system of investor insurance that reimburses investors for any decline in the value of their investments.'" *Meyer,* 710 F.3d at 1196 (citing *Robbins*).

The Eleventh Circuit's holding in *Robbins* was adopted by the Supreme Court in *Dura*:

> *[A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.* Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. *When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of the lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.*

544 U.S. at 342-43 (emphasis added, internal citations omitted).

The logic behind *Robbins* and *Dura* applies with even greater force here. Plaintiffs' failure to show that the Property, and in turn, Plaintiffs' shares, was worth more than Pulwer paid for it on September 3, 2014 precludes Plaintiffs from stating the causal link necessary to satisfy

the loss causation requirement of a 10b-5 claim.   Again, any profit Defendants made *10 months after* the stock purchase agreement was signed was the direct result of the increased demand for the property *at that time*.[5]

Similarly, Plaintiffs cannot establish the element of reliance.  Tellingly, Plaintiffs never allege that but for the supposed omissions, they would **not** have sold their shares to Pulwer.  *See Dura,* 544 U.S. at 343-44.

The following example explains why this critical allegation is conspicuously absent. Suppose that prior to the stock sale Plaintiffs were provided with the information that was allegedly withheld (*i.e.* that Pulwer was "contacted" by a broker regarding including the Property in a "preliminary" assemblage).  In that scenario, it would be unreasonable for Plaintiffs to conclude—based solely on that "special knowledge"—that the Property was worth more. Plaintiffs would have no guaranty that the assemblage would ever come to pass, that a buyer would make an offer, or that the Property would demand a premium.   In fact, based on what little Plaintiffs have alleged, it would be just as reasonable for Plaintiffs to conclude that there was no imminent opportunity for sale of the Property.  As a result, Plaintiffs cannot allege that if they had the supposed "missing" information, they would have acted any differently.  This example further demonstrates that even if Pulwer had the supposed "special knowledge," it was Pulwer that would have been taking a risk—with no assurance that he could demand and be paid more for the Property—by agreeing to purchase Plaintiffs' shares when he did.

---

[5] This is exactly the type of changed market condition that negated loss causation in *Dura,* 544 U.S. at 343; *see also In re Sawtek, Inc. Sec. Litig.,* No. 603CV294ORL31DAB, 2005 WL 2465041, at *13 n.5 (M.D. Fla. 2005) (taking judicial notice of the substantial decline in the U.S. stock market during the relevant period of time and dismissing the complaint based on, *inter alia,* plaintiffs' failure to prove loss causation); *In re Teco Energy, Inc. Sec. Litig.,* No. 04-CV-1948-T-27EAJ, 2006 WL 845161, at *5 (M.D. Fla. 2006) (dismissing complaint because "Plaintiffs [had] not sufficiently alleged that Defendants' fraud, as opposed to poor market conditions, was the proximate cause of TECO's stock price decline.").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

For these reasons as well, Plaintiffs' Rule 10b-5 claim should be dismissed.

### 2.   Plaintiffs' Allegations Do Not Raise Any Inference of Scienter

The same deficiencies underlying Plantiffs' economic loss, loss causation, and reliance allegations cause Plaintiffs' Complaint to suffer from yet another fundamental flaw:  it fails to raise a "strong inference" that Pulwer acted with scienter.

With respect to each act or omission alleged to violate Rule 10b-5, the PSLRA raises the standard and requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 USC § 78u-4(b)(2)).  The requisite "strong inference" of scienter can only be alleged by pleading facts establishing that a defendant acted with the "intent to deceive, manipulate, or defraud" or with "severe recklessness." *Mizzaro*, 544 F.3d at 1238 (internal quotations omitted).[6]

In this Circuit, "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282-83 (11th Cir. 1999).

The Supreme Court in *Tellabs* further emphasized the high bar that must be met in pleading scienter. The required inference of scienter must rise to the level of "cogent and compelling." *Id.*, 127 S. Ct. at 2510. And, in determining whether this standard has been met, a court is obligated to consider *all* of the inferences raised by the facts alleged in a complaint, including inferences that negate scienter:

---

[6] The required strong inference of scienter also must be pled *as to each defendant* and with respect to each alleged violation. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017-1018 (11th Cir. 2004); *Miva, Inc. Securities Litigation*, No. 05-CV-201-FtM-29DNF, 2007 WL 809686, at * 2 (M.D. Fla. 2008). Here, Plaintiff's allegations either lump Defendants together or refer only to Pulwer's "special knowledge." Because there are no specific factual allegations addressing scienter for Chen Neal, Plaintiff's claims against Chen Neal should be dismissed.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  *To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.*  The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,' . . . . Yet, the inference of scienter must be more than merely 'reasonable' or 'permissible'—*it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.*

*Id.* (emphasis added, internal citations omitted).

Plaintiffs' conclusory allegations that Pulwer "defrauded" Plaintiffs are insufficient to meet the plausibility pleading threshold under *Twombly* and *Iqbal,* let alone the exacting "strong inference" of scienter standard.

Again, Plaintiffs' "special knowledge" argument is grounded on the premise that at the time of the stock sale, Pulwer knew the Property value had increased and intentionally withheld that information from Plaintiffs.  But, here as well, Plaintiffs' argument cannot leave the starting gate.  Plaintiffs' contention that the Property value spontaneously increased simply because two real estate agents expressed interest in brokering the Property is untenable.  Because Plaintiffs provide no facts demonstrating that the Property value actually increased, Pulwer had no information to withhold and thus could not possibly have the intent to deceive Plaintiffs.

Moreover, even assuming Plaintiffs' impossible premise was true—that the Property's value increased prior to the stock sale—the Complaint still does not allege scienter.  Plaintiffs' "special knowledge" contention hinges on a single allegation that "between 2012 and September 2013, the RE Brokers contacted Pulwer as a representative of DBRM regarding purchasing the Property for inclusion in the Property Assemblage." (Cmpl. at ¶53).

This contention could not be any vaguer.  Plaintiff does not identify the means by which Pulwer was contacted or how many times Pulwer was contacted.  Nor does Plaintiff describe the substance of the discussion between the brokers and Pulwer, including whether (1) a specific buyer was discussed; (2) an offer was presented; or (3) Pulwer indicated an intention to sell the Property.  Possibly most troubling is Plaintiffs' inability to allege with any degree of specificity when Pulwer obtained the alleged "special knowledge."  The best Plaintiffs can do is provide a vast **21 month** timeframe within which the brokers allegedly "contacted" Pulwer.

Plaintiffs' account of how Pulwer perpetrated his "fraud" is equally unclear.  Plaintiffs allege that "Pulwer communicated with Plaintiffs (via instruments of interstate commerce, such as e-mail) regarding purchasing Plaintiffs' shares in DBRM.  These communications included discussions regarding the value of the DBRM stock, and how to calculate same."  (*Id.* at ¶60).  Plaintiffs then ambiguously assert that the supposed email communication took place sometime after Pulwer "obtained the special knowledge." *See id.*

Plaintiffs, however, fail to attach the alleged email to the Complaint or identify any details regarding the email such as (i) the date it was sent; (ii) the recipient(s); (iii) the specific content contained therein; or (iv) in what context the communication arose.  This omission is particularly curious considering Plaintiffs attach emails having nothing whatsoever to do with the alleged fraud, including: (1) a December 17, 2013 email from Pulwer's counsel to counsel for Plaintiffs (*see id* Ex. B); and (2) an email exchange between Pulwer and Plaintiff James Resnick from August 2014 (*see id.* Ex. C).  Both of the emails Plaintiffs chose to showcase post-date the signing of the stock purchase agreement, and thus bear no relevance to Plaintiffs' claims.

Moreover, even if Plaintiffs had properly plead the specifics regarding Pulwer's obtaining of the purported "special knowledge" and failure to disclose it to Plaintiffs, there are several

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

competing inferences to explain Pulwer's alleged behavior, including: (1) Pulwer did not receive an offer or any other indication that the inquiry was serious enough to deem it material; (2) Pulwer dismissed the inquiry because he had no interest in selling the property; or (3) Pulwer simply did not remember (perhaps even negligently) to convey the information to Plaintiffs.

These inferences are more compelling than the inference Plaintiff offers that Pulwer purposefully withheld the "truth" from Plaintiffs with the intent to defraud them. *See Thompson v. RelationServe Media, Inc.,* 610 F.3d 628, 634-35 (11th Cir. 2010) (allegations insufficient to create strong inference of scienter where "the inference of nefarious wrongdoing" was not "at least as compelling as any opposing inference of nonfraudulent intent.") (citations omitted).

The net result is that Plaintiffs' imprecise allegations create more questions than they provide answers and therefore fail to raise a strong inference that Pulwer acted with mal intent. *See Tellabs,* at 2511 (quoting § 78u-4(b)(2)) ("omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"); *In re Paincare Holdings Sec. Litig.,* No. 06-cv-362-Orl-28DAB, 2007 WL 1229703, *7 (M.D. Fla. 2007) (plaintiff failed to sufficiently allege scienter where it relied on "bald conclusions" rather than factual allegations); *see also Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.,* No. 10 C 7031, 2012 WL 1030474, at *4 (N.D. Ill. Mar. 27, 2012) ("[T]he court cannot draw any inferences from allegations that are not themselves well pleaded; zero plus zero is zero.") (quotations omitted).

In sum, rather than presenting a legitimate claim to redress an actual economic loss, Plaintiffs' Complaint is an attempt to use the securities laws to take advantage of a real estate opportunity they are simply not entitled to. *See Garcia,* 528 F. Supp. 2d at1293 ("not only is the inference that Plaintiffs are suffering from buyers' remorse and seeking to use the federal

14

securities laws to escape their obligations under those contracts more compelling than an inference of intent to defraud, it is the only plausible inference."); *see also In re Sawtek, Inc. Sec. Lit.,* 2005 WL 2465041 at *13 ("this case appears to be a classic example of the 'fraud by hindsight' that the Reform Act was designed to eliminate.").

For all of aforementioned reasons, Plaintiffs' 10b-5 claim fails as a matter of law.

**B.      Plaintiffs' State Law Claims Must Also Be Dismissed[7]**

Each of Plaintiffs' state law claims are predicated on fraud, and are therefore subject to Rule 9(b)'s heightened pleading standard. *See* note 2, *supra*. None satisfy this requirement.

**1.      Plaintiff's Common Law Fraud and Fraud in the Inducement Claims are Baseless**

To state a claim for common law fraud under Florida law, a party must allege: (1) the defendant made a false statement or omission of material fact; (2) the defendant knew the statement was false; (3) the statement was made for the purpose of inducing plaintiff to rely on it; (4) plaintiff's reliance was reasonable; and (5) plaintiff suffered damages. *Arnold,* 839 F. Supp. 2d at 1289 (internal citations omitted); *see also Pettinelli v. Danzig,* 722 F.2d 706, 709 (11th Cir. 1984).[8]

The same infirmities that doom Plaintiffs' 10b-5 claim are equally fatal to Plaintiffs' state common law fraud claims.  Again, Plaintiff cannot state a claim for fraud or fraud in the inducement because Plaintiffs have failed to, among other things, (i) allege facts supporting the contention that they were damaged; (ii) provide even the most basic factual details regarding the

---

[7] Because Plaintiffs' Rule 10-b claim warrants dismissal, the Court should also dismiss Plaintiff's state law claims for want of federal subject matter jurisdiction under 28 U.S.C. §1367(c)(3). *See* 28 U.S.C. § 1367(c); *see also Mergens v. Dreyfoos,* 166 F.3d 1114, 1116 (11th Cir. 1999) (district court did not abuse its discretion in declining to exercise jurisdiction over pendant state law claims and noting that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims.").
[8] The elements of a claim for fraud in the inducement are identical to the elements of common law fraud. *See Liva v. Mendolia,* No. 9:13-cv-81047-KAM, 2014 WL 2118814, at *4 (S.D. Fla. May 21, 2014) (citing *Prieto v. Smook, Inc.,* 97 So. 3d 916, 917 (Fla. 4th DCA 2012)).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

"special knowledge" Pulwer supposedly obtained; (iii) describe the specifics surrounding Pulwer's purported omission; (iv) confirm that Plaintiff would have acted differently if not for the omission; and (v) explain why Plaintiffs would have be justified in so relying on the supposed omission.

Accordingly, Plaintiffs state law fraud claims should also be rejected out of hand.

### 2.   Plaintiffs' Claims for Unjust Enrichment and Constructive Trust are Equally Meritless

The elements of a cause of action for unjust enrichment are: (1) the Plaintiff has conferred a benefit on the Defendant; (2) the Defendant has knowledge of the benefit; (3) the Defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the Defendant to retain the benefit without paying fair value." *Media Services Group, Inc. v. Bay Cities Comm'cns, Inc.*, 237 F.3d 1326, 1330–31 (11th Cir. 2001).

Here again, because Plaintiffs fail to articulate a legally cognizable injury, Plaintiffs cannot allege that they conferred a benefit on Defendants for which Plaintiffs have not been fairly compensated. Plaintiffs willingly entered into an arm's length stock purchase agreement and they were paid $1 million for their shares. Plaintiff offers no legal recognized theory for why they are entitled to the proceeds of Pulwer's subsequent sale of the Property.

Relatedly, to state a claim for constructive trust, the following four elements must be established: (1) a promise, express or implied; (2) transfer of the property and reliance thereon; (3) a confidential relationship; and (4) unjust enrichment." *Gersh v. Cofman*, 769 So. 2d 407, 409 (Fla. 4th DCA 2000). Here as well, Plaintiffs' allegations are deficient because they cannot establish the fourth element of unjust enrichment. Once more, Pulwer did not receive or retain a conferred benefit from Plaintiffs that Plaintiffs were not fairly compensated for. Nor does the

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Complaint adequately allege that Plaintiffs and Pulwer had a confidential relationship.   For these reasons as well, Plaintiff's constructive trust claim should also be dismissed.

### C.   Plaintiff's Breach of Fiduciary Duty Claim Is Also Unsupported

To state a claim for breach of fiduciary duty in Florida, a plaintiff must show: (i) the existence of a fiduciary duty; (ii) the defendant breached that duty; and (ii) the defendant's breach proximately caused the plaintiff's damages.  *Lindquist v. Linxian*, No. 11-23876-Civ, 2012 WL 3811800 (S.D. Fla. Sept. 4, 2012) (citing *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla.2002)).

As a threshold matter, for the same reason Plaintiffs cannot allege an economic loss, they cannot state a claim for breach of fiduciary duty:  the Complaint fails to adequately allege any legally cognizable damages.  But even if Plaintiffs had properly pled damages, Plaintiffs fail to allege with any degree of particularity why Pulwer owed Plaintiffs any duty whatsoever.

Pulwer was not an officer or director of DBRM.  Plaintiffs admit as much in their Complaint.  *See* Cmpl. ¶27 ("***Pulwer was not listed with the Florida Secretary of State as an officer or director of DBRM***" and "***Laurence and Renee Feingold were identified in the public records as officer and/or director of DBRM***.") (emphasis added).

It is no doubt for this reason that Plaintiffs go to great lengths to portray Pulwer as a "*de facto*" officer and/or director of DBRM."   (*Id.* at ¶26).  In the four and a half pages of the Complaint devoted to Pulwer's "*de facto*" control, Plaintiffs point to Pulwer's (a) control over "the Property's operations on a day-to-day basis"; (b) execution of a personal guarantee as collateral for DBRM's mortgage; (c) "responsibility for, and care of, items such as the mortgage payments owed by DBRM . . .[and] payment of the Property's taxes and DBRM's taxes and other financial responsibilities of DBRM and the Property"; (d) control of DBRM's principal

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

place of business and mailing address; and (e) keeping of DBRM's financial information and books and records. (*Id.* at ¶¶25-38).

Accepting each of these contentions as true, none of these facts are sufficient to create a fiduciary duty owed by Pulwer to Plaintiffs. As Plaintiff acknowledges, at the time of the stock purchase, Defendants collectively controlled 50 percent of DBRM stock.[9] Plaintiffs collectively controlled the other 50 percent. This 50/50 ownership structure resulted in shared control over DBRM, not the one-sided control position for Pulwer that Plaintiffs suggest.

Nor have Plaintiffs alleged any particularized facts to support the conclusion that Pulwer, a shareholder with a minority equity stake, was able to exercise actual control over DBRM's business decisions. *See In re N & D Properties, Inc.,* 799 F.2d 726 (11th Cir. 1986) ("a fiduciary, under general corporate theory, includes an officer, director, agent, majority shareholder or a minority shareholder exercising actual control over the corporation."); *see also Does a Florida Minority Shareholder In a Closely Held Corporation Owe a Fiduciary Duty to Fellow Shareholders?,* 79-OCT Fla. B.J. 55 (Oct. 2005) ("there is no fiduciary duty or obligation due from a minority shareholder to the corporation or to other shareholders unless that shareholder is also a director, officer, or controlling insider.") (citing Jeffrey M. McFarland, *Florida Corporation Law: Proposed Statutory Relief for Oppressed Minority Shareholders in Florida,* 46 Fla. L. Rev. 149, 157 (1994)).

Plaintiffs' allegation that "Plaintiffs placed their trust and confidence in Pulwer, and relied on Pulwer, and Pulwer accepted such trust and confidence" is equally insufficient to give rise to a fiduciary duty. (Cmpl. ¶45). Notably, Plaintiffs provide no specific facts explaining how Pulwer "accepted" Plaintiffs' "trust and confidence." Indeed, it is well-established that a

---

[9] Chen Neal previously owned 40 percent of DBRM stock, and Pulwer thereafter acquiring Feingold's 10 percent voting rights. (Cmpl. ¶23).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

fiduciary relationship is not created simply because one party decides to trust the other. *See Lanz v. Resolution Trust Corp.,* 764 F. Supp. 176, 179 (S.D. Fla. 1991); *Harris v. Zeuch,* 137 So. 135, 138 (1931); *Barnett Bank of West Florida v. Hooper,* 498 So. 2d 923, 928 (Fla. 1986) (Boyd, J., dissenting).

On this issue, Judge Gold's decision in *Amoco Oil Co. v. Gomez,* 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000) is instructive. In *Amoco,* Amoco sued one if its franchisees after she allegedly failed to pay Amoco its commission receipts and closed down her gas station. *Id.* at 495. The defendant filed a counterclaim against Amoco alleging that she was forced to close her gas station because she learned there were environmental problems with the station, and Amoco knew about the problems but failed to disclose them prior to entering into the franchise lease. *Id.* The defendant brought a claim for breach of fiduciary duty, alleging, as Plaintiffs do here, that a fiduciary relationship arose between the parties that required Amoco to disclose the environmental problems with the property. *Id.* at 509.

The Court squarely rejected the franchisee's contention that a fiduciary duty was created:

> A fiduciary relationship exists when there is a relationship of trust and confidence between parties, ***where confidence is given by one and trust is accepted by the other. It is not enough for Gomez to prove that she placed her trust and confidence in Amoco or his agent, Jose Contreras. She also must introduce "substantial evidence" that Amoco recognized, accepted, or undertook the duties of a fiduciary—that of advising, counseling, and protecting Gomez.*** . . . It may be true that Contreras influenced Gomez, that Gomez was looking to Contreras to protect her interest, and that Gomez trusted Contreras "to the point where she bought a contaminated 'lemon' gas station that was not even on the market,"[] ***but it does not automatically follow that Contreras "recognized, accepted, or undertook" the duties of "advising, counseling, and protecting" Gomez.***

*Id.* at 509-510 (emphasis added) (internal citations omitted); *see also Silver,* 760 F. Supp. 2d at 1339 ("[a]lthough [the plaintiff] alleges that she placed her trust and confidence in [defendant],

one may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance of such duties, no fiduciary relationship is created.").

Accordingly, Plaintiffs' breach of fiduciary duty claim cannot stand.

## **CONCLUSION**

Plaintiffs' attempt to transform a run-of-the-mill stock sale into a "fraud" in violation of section 10b-5 of the securities laws is unavailing.   Plaintiffs sold their stock to Pulwer on September 3, 2013 in an arm's length transaction. The price Plaintiffs received for their stock set the fair market value for the Property on that date, and Plaintiffs have not plead any facts indicating otherwise.   The fact that two real estate brokers may have made efforts to secure a "preliminary assemblage," "intended" to broker the Property, and "contacted" Pulwer about his interest in selling the Property is insufficient to establish that the Property was worth anything more on the date of the stock sale than what Pulwer paid.

There is no question that Pulwer sold his shares 10 months later and made a sizable profit.  But the fact that Pulwer benefited from his purchase and subsequent sale of the stock does not mean Pulwer violated the federal securities laws—it means he made a good investment.

For these reasons, Plaintiffs' pleading falls woefully short of the heightened pleading standards required by applicable rule based, statutory, and judicial authority to sustain a 10b-5 theory of liability.  Plaintiffs' state law fraud claims are equally deficient, and Plaintiffs have failed to plead that Pulwer owed Plaintiff any fiduciary duty.

Accordingly, Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice and award Defendants attorney's fees and costs incurred in having to defend this action pursuant to the agreement between the parties.

Dated: February 6, 2015.

Respectfully Submitted,

/s/ Mitchell E. Widom
Mitchell E. Widom
Florida Bar No. 473911
Lori P. Lustrin
Florida Bar No. 59228
**BILZIN SUMBER BAENA
PRICE & AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593
E-mail: mwidom@bilzin.com
　　　　llustrin@bilzin.com

*and*

Kent Harrison Robbins
Florida Bar No. 275484
1224 Washington Avenue
Miami Beach, FL 33139-4614
Telephone (305) 532-0500
Facsimile: (305) 531-0150
Email: khr@khrlawoffices.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was electronically served upon the parties and counsel of record through the Court's ECF system on February 6, 2015.

<u>/s/ Mitchell E. Widom</u>
MITCHELL E. WIDOM

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456